UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SHERRY RILEY, | : | Case No. 3:11-cv-194 |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED; AND (2) THIS CASE IS CLOSED**

This is a Social Security disability benefits appeal. At issue is whether the administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and therefore unentitled to disability insurance benefits ("DIB"). (*See* Administrative Transcript ("Tr.") (Tr. 13-25) (ALJ's decision)).

**I.**

On July 20, 2006, Plaintiff filed for DIB, alleging an onset date of June 30, 2004 (Tr. 84-86), due to peripheral artery disease ("PAD").[1] Plaintiff later amended the onset date to July 20, 2006. (Tr. 35).

Plaintiff's claims were denied initially and upon reconsideration. (Tr. 45-59, 62-64). Thereafter, Plaintiff requested a hearing where she appeared with an attorney and testified on August 20, 2009. (Tr. 32-53). On January 6, 2009, the ALJ issued a decision

---

[1] PAD is a narrowing of the peripheral arteries, most commonly in the arteries of the pelvis and legs. PAD is similar to coronary artery disease and carotid artery disease. All three conditions are caused by narrowed and blocked arteries in various critical regions of the body.

denying benefits. (Tr. 20-25). Subsequently, the Appeals Council denied review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-4). Plaintiff then commenced this action in federal court for judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

Plaintiff was 55 years old at the time her disability began, a person of advanced age in the eyes of Social Security. (Tr. 84); 20 C.F.R. § 416.963(d). Plaintiff has a high school education and obtained an associates degree in accounting and general business management. (Tr. 36, 115, 206). Plaintiff worked almost 24 years for the same company as an accounting specialist before being laid off in 2004. (Tr. 37, 206, 1000, 109). Plaintiff processed orders, input data, and invoiced customers.[2] (Tr. 37). After she was laid off, Plaintiff sent out resumes and applied for hundreds of jobs but was unsuccessful in obtaining another position, so she applied for food stamps and worked the mandatory 29 hours a month at the Salvation Army to get them. (Tr. 206). Because she was having trouble standing, the Salvation Army moved her to an office position doing filing, but she felt "closed in," and that the work was "menial." (Tr. 260). Plaintiff quit the job and applied for disability benefits. (Tr. 206).

The ALJ's "Findings," which represent the rationale of her decision, were as follows:

    1.    The claimant meets the insured status requirements of the Social

---

[2] The vocational expert testified that the "past work fits best with an account clerk/cost clerk" which he classified as sedentary and semiskilled. (Tr. 48).

    Security Act through March 31, 2010.

  2. The claimant has not engaged in substantial gainful activity since July 20, 2006, the amended alleged onset date (20 CFR 404.1571 *et seq.*).

  3. The claimant has the following severe impairment: peripheral arterial disease ("PAD") (20 CFR 404.1520(c)).

  4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

  5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(c) subject to the following additional limitation: stand four hours per day at 30 minute intervals.

  6. The claimant is capable of performing past relevant work (20 CFR 404.1565).

  7. The claimant has not been under a disability, as defined in the Social Security Act, from July 20, 2006 through the date of this decision (20 CFR 404.1520(f)).

(Tr. 15-25).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations and was therefore not entitled to DIB. (Tr. 25). Specifically, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC")[3] to perform a limited range of light work.[4] (Tr. 15-29).

---

  [3] The Agency defines RFC as "the most you can still do despite your limitations." 20 C.F.R. § 404.1545(a)(1).

  [4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of object weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting more of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

On appeal, Plaintiff argues that: (1) the ALJ erred in failing to find a severe mental health impairment based on a state agency opinion, where subsequent mental health records document continuing severe depression and anxiety; and (2) the ALJ erred in finding that the RFC was supported by substantial evidence where even the state agency physician opinion documented greater limitations on Plaintiff's ability to perform the postural demands of work. The Court will address each argument in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

**A.**

The record reflects that:

In 2001, Plaintiff was evaluated by specialist Paul F. Heyse, M.D., in consultation with Plaintiff's primary care physician, Kent Scholl, M.D. (Tr. 236). At the time, Plaintiff reported progressively disabling lower extremity pain due to claudication.[5] (Tr. 236). A Doppler flow study showed marked abnormalities with ankle brachial indices in the 30 percent range. (Tr. 167, 236). Dr. Heyse performed an aortobifemoral bypass. (Tr. 169). Plaintiff did well in follow-up. (Tr. 234).

In November 2003, Plaintiff was seen by a colleague of Dr. Heyse, Damian I. Lebamoff, M.D. Plaintiff reported a return of her claudication symptoms. A pulse volume recorder ("PVR") study[6] showed some claudication indices. (Tr. 233). Indeed, an arterial Doppler flow study continued to document significant occlusive arterial disease and arterial insufficiency of the right leg. The resting right ankle brachial indices

---

[5] Claudication presents cramping pains in the buttock or leg muscles caused by poor circulation of the blood to the affected area.

[6] A PVR study is a vascular test in which blood pressure cuffs and a hand-held ultrasound device are used to obtain information about arterial blood flow in the arms and legs.

were in the "severe claudication range." (Tr. 175). Dr. Lebamoff prescribed Pletal, which improved Plaintiff's symptoms of claudication. (Tr. 232-33).

Plaintiff was evaluated again for the disease in her right lower leg in 2005. She told Dr. Scholl that she was having severe pain much like she had before her surgery. (Tr. 302). She also reported to her specialist, Dr. Lebamoff, that her symptoms of claudication had worsened over the past year, and Dr. Lebamoff noted that a PVR Doppler study showed normal indices at rest, but a significant drop post exercise. (Tr. 233). The PVR showed a "severe drop in the bilateral ankle brachial indices post exercise. Correlating this with the resting study suggests severe right superficial femoral artery disease and left lower extremity small-vessel disease." (Tr. 256). Dr. Lebamoff diagnosed a peripheral arterial occlusive disease with claudication and recommended an angiographic study. (Tr. 233).

The angiographic study in June 2005 showed an infrapopliteal occlusion in the right lower extremity with collateral reconstitution. (Tr. 192). Plaintiff's veins were inadequate for bypass, so Dr. Lebamoff recommended observation. In a letter dated December 9, 2005, Dr. Lebamoff indicated that Plaintiff was unable to do prolonged ambulation due to her inoperable peripheral arterial occlusive disease. Dr. Lebamoff also noted that Plaintiff should not perform any heavy lifting. (Tr. 230).

Dr. Scholl indicated in a teledictation report in October 2006 that he had been treating Plaintiff since February 2001 for chronic depression and anxiety as well as other problems, such as back pain. He prescribed Paxil and Xanax for her depression and

anxiety as well as Vicodin for back pain. Dr. Scholl concluded, "[i]t is my opinion that this person should be considered totally and permanently disabled mainly because of her psychiatric problems." (Tr. 237).

In October 2006, Plaintiff was sent by the State agency for a psychological evaluation with Giovanni Bonds, Ph.D. (Tr. 205-13). Plaintiff told Dr. Bonds that in addition to her physical problems, she has problems with comprehension, attention, completing tasks, and nervousness. (Tr. 206). Plaintiff told Dr. Bonds that she was able to make coffee, watch TV, run errands, go to appointments, shop at the grocery store, clean her house, and occasionally cook, though she sometimes got distracted. (Tr. 209). She did her laundry, paid her own bills, drove her own car, and played with her grandchildren when they visited. (Tr. 209). On mental status examination, Dr. Bonds noted that Plaintiff's mood was normal and affect was broad and appropriate to thought content. She did not express "marked feelings of hopelessness, helplessness, worthlessness or guilt." (Tr. 207). Plaintiff did note that, prior to medication, she flew off the handle. Dr. Bonds noted that Plaintiff seemed a little tense and nervous during the interview. Plaintiff reported that she often feels nervous inside and has had panic attacks, but with Xanax the panic attacks had ceased. Plaintiff reported that she is not afraid to leave her home, but she does avoid people to some degree. (Tr. 208). Plaintiff reported that she has difficulty completing tasks without becoming distracted or losing interest. (Tr. 209).

Dr. Bonds diagnosed a generalized anxiety disorder as well as a mood disorder.

She assigned a global assessment of functioning ("GAF") of 65.[7] (Tr. 211). Plaintiff's full scale IQ was 99 – demonstrating average intelligence – and she had average memory as well. (Tr. 209-210). Dr. Bonds did not think that Plaintiff was limited in her ability to maintain attention, concentration, persistence, or pace to perform simple repetitive tasks. Dr. Bonds did note that Plaintiff's mental ability to withstand the stress and pressure associated with day-to-day work activities was mildly limited. "Because of Sherry's anxiety she would have some difficulties with work demands for speed, accuracy and productivity." (Tr. 211).

Plaintiff was evaluated at Crisis Care in October 2006 where she was diagnosed with a Bipolar I Disorder. (Tr. 257-68). She was assigned a GAF of 45[8] and referred to Eastway for treatment. (Tr. 257).

At her psychiatric evaluation, Plaintiff presented with crying episodes, decreased energy with daily naps, racing thoughts at bedtime, anxiety, and panic attacks around people. (Tr. 293). Mental status examination showed an anxious mood and full affect. (Tr. 294). During her diagnostic assessment, Plaintiff reported that she has difficulty

---

[7] The GAF is a numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living. A score of 61-70 indicates some mild symptoms are present (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

[8] A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

controlling her worry and can only temporarily alleviate it by napping.  She reported other symptoms of anxiety including restlessness, difficulty concentrating, irritability, and shoulder tension.  Plaintiff also noted symptoms of depression, such as depressed mood two days per week, loss of interest in activities daily, loss of appetite, and excessive sleep.  (Tr. 291).  She was diagnosed with a major depressive disorder and a generalized anxiety disorder.  (Tr. 292).  The psychiatrist assigned a GAF of 50.  (Tr. 280).

The State agency sent Plaintiff for additional testing and evaluation with Damian M. Danopulos, M.D., in November 2006.  Doppler studies performed at rest by Dr. Danopulos showed ankle brachial ratios of .809 on the right and $1.263^9$ on the left.  (Tr. 238).  Dr. Danopulos noted that there was no dyspnea or effort related shortness of breath, placing her functional Class NYHA between I and II.[10]  Dr. Danopulos indicated that the Doppler studies showed Plaintiff suffered from a mild degree of arterial obstructive disease in the right extremity at rest.  (Tr. 243).

A State agency physician reviewed the file following this examination.  The reviewing physician thought that Plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently.  She could stand/walk for at least two hours in an eight-hour workday.  (Tr. 245).  The reviewing physician noted that Plaintiff could only occasionally climb,

---

[9]  A brachial ratio of 0.5-0.8 indicates moderate arterial disease; above 1.2 indicates abnormal vessel hardening.

[10]  Physicians often assess the stages of heart failure according to the New York Heart Association ("NYHA") functional classification system.  Class I indicates no limitation of physical activity – ordinary physical activity does not cause undue fatigue.  Class II indicates slight limitation of physical activity -- comfortable at rest, but ordinary physical activity results in fatigue.

balance, stoop, kneel, crouch, or crawl, and should never climb ladder/rope/scaffolds. (Tr. 246). The reviewing physician also noted that Plaintiff should avoid all exposure to hazards, including moving machinery, heights, and commercial driving. (Tr. 248).

Plaintiff continued to follow up with Dr. Toca, the psychiatrist at Eastway. In December 2006, Plaintiff reported problems with dizzy spells affecting her balance. Plaintiff related this to her tinnitus.[11] Plaintiff reported that she would have problems going to work and noted it would not be "fair to an employer because I am not sure if I would be able to go to work because of the dizzy spells," and loss of coordination. (Tr. 277).

In May 2007, Dr. Scholl again indicated that he treated Plaintiff about every three months for her chronic depression and anxiety as well as back pain. (Tr. 253). In December 2007, Dr. Scholl completed an assessment (check box form) of Plaintiff's mental abilities in a form for Montgomery County Department of Jobs & Family Services. (Tr. 380-81). Dr. Scholl noted that Plaintiff was extremely limited in her ability to perform activities within a schedule or maintain regular attendance and her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. Dr. Scholl also noted that Plaintiff was markedly impaired in her ability to: understand, remember, and carry out detailed instructions; maintain concentration and attention for extended periods; work in coordination with others; and respond appropriately to supervision or changes in the work place. (Tr. 380).

---

[11] Tinnitus is the perception of sound within the human ear in the absence of the corresponding external sound.

Dr. Scholl concluded that due to chronic anxiety and depression, Plaintiff was unable to handle stress. (Tr. 381).

In December 2007, Plaintiff was evaluated at South Community Mental Health. (Tr. 351-64). She reported symptoms of decreased concentration despite medication for depression and anxiety. She noted that she still had times where she cries for days at a time and also had panic and anxiety. (Tr. 351). She reported difficulty staying on task and completing tasks which frustrated her. (Tr. 358). Plaintiff also indicated that when she feels depressed, she feels helpless, hopeless, overwhelmed, worthless, has decreased energy, interest and motivation, and has low self-esteem. (Tr. 361). On mental status examination, her mood was described as depressed and her affect full. She had some impairment in attention and concentration, but her insight and judgment were described as fair. (Tr. 364). Plaintiff was diagnosed with a major depressive disorder and anxiety and assigned a GAF of 52.[12] (Tr. 361).

Plaintiff began therapy at South Community in January 2008 with Elizabeth Ellington, a psychology trainee, who was supervised by Mary Jane Kocian-Figueroa, Psy.D. (Tr. 346-47). In an early session, Counselor Ellington described Plaintiff's mood as sad, and she was tearful at several points during the session. (Tr. 344). Two weeks later, her mood seemed angry and frustrated during parts of the session. (Tr. 340). In March, her mood was both sad and angry, and she cried at several points during the

---

[12] A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

-11-

session. (Tr. 335). In late March, Plaintiff reported "stress attacks" due to feeling overwhelmed by various house projects. (Tr. 331). She also reported smoking to cope with her stress, which made her angry with herself. (Tr. 325).

Plaintiff was evaluated by a psychiatrist, Dr. Fitz, on April 28, 2008. (Tr. 319-23). Plaintiff reported depression and anxiety. (Tr. 319). Her mood was described as depressed and anxious and her affect was full. She showed impairment in attention and concentration. The psychiatrist diagnosed a major depressive disorder, an anxiety disorder, and assigned a GAF of 52. (Tr. 321).

In June 2008, Dr. Scholl completed assessments about Plaintiff's ability to work. (Tr. 365- 80). Mentally, Dr. Scholl did not think that Plaintiff could perform most of the mental demands of work due to her anxiety. (Tr. 373-78). He noted in particular that stress caused increased anxiety. (Tr. 375). Physically, Dr. Scholl did not think that Plaintiff could lift more than 10 pounds, stand/walk for more than one hour, or sit for more than two hours in an eight-hour workday due to chronic back pain. (Tr. 365-66). Dr. Scholl also noted that Plaintiff was limited in her ability to perform postural activities. (Tr. 367). Dr. Scholl concluded that Plaintiff could not sustain even sedentary work on a regular and continuing basis. (Tr. 369).

Plaintiff continued treatment at South Community. In June 2008, she had partial achievement of her goals. (Tr. 411). However, her mood was more depressed compared with the previous session. Plaintiff indicated that she had experienced some suicidal ideation the previous week. (Tr. 406). By late June 2008, Plaintiff was very angry. (Tr.

-12-

404). On July 7, the therapist noted Plaintiff's mood seemed even more depressed (Tr. 401), but by the end of July 2008, Plaintiff's mood seemed more euthymic (Tr. 396).

On August 12, 2008, Plaintiff was seen in the emergency room for an anxiety episode. (Tr. 385-91). When she arrived in the emergency room, she was shaking all over, had shortness of breath, and was unable to answer questions. Apparently she had experienced a similar event a few days previously while at a Kroger. (Tr. 385). Plaintiff reported that she had difficulty forming complete sentences during the episodes and reported sleeping 12-15 hours at a time. (Tr. 394). Plaintiff was given a GAF of 55 (Tr. 408) and was to continue obtaining her medications from her primary care physician (Tr. 409).

Because Dr. Scholl retired, Plaintiff began treatment at the Corwin Nixon Clinic. (Tr. 412-32 ). Plaintiff reported continued problems with increasing back and hip pain. On examination, her gait was slow and careful and her legs trembled as she walked and stood. In March 2009, she reported continued problems with vertigo and she also felt that she was having anxiety attacks daily. Plaintiff was given medication to help the anxiety and counteract the sleepiness. (Tr. 416).

At the hearing Plaintiff testified that physically she has problems with her back, hips, and legs. Her balance was off and she had vascular problems in her legs. (Tr. 38-39). Plaintiff also testified to long-term problems with migraines and claimed that she has had mini-strokes over the prior six weeks.[13] (Tr. 40, 49). Mentally, Plaintiff testified that

---

[13] Plaintiff does not offer any objective evidence to support this contention.

she had severe bouts of depression and anxiety attacks and that the mental health problems had worsened over the past few years. (Tr. 41).

Plaintiff estimated that she could walk about five minutes before needing to stop. She thought that she could sit about 30 minutes at a time if she shifted her weight in the chair. (Tr. 44). Plaintiff testified that she did not lift much and her grandchildren carry her groceries for her. (Tr. 44). Plaintiff testified that she has difficulty performing household chores due to her physical impairments. For example, she can only vacuum one room at a time or wash dishes for 10 minutes before she needs to sit down and rest. (Tr. 42-43). Her balance problems interfere with maneuvering the stairs to her basement to do laundry and she usually microwaves her meals. (Tr. 43). She cannot garden anymore because she cannot get up and down. (Tr. 46).

**B.**

First, Plaintiff maintains that the ALJ erred in failing to find a severe mental impairment.

In making its determination, the ALJ gave great weight to the opinions of Drs. Flynn and Bonds because they are mental health specialists. (Tr. 18, 47). 20 C.F.R. § 404.1527(d)(5) ("Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Moreover, their assessments were consistent with the evidence as a whole. *See* 20 CFR § 404.1527(d)(5). Dr. Bonds thought Plaintiff would have only slight-to-mild limitations, and Dr. Flynn found that Plaintiff did not have any

severe mental impairments. (Tr. 16-17, 207-212, 214). For example, the ALJ noted that Plaintiff had been taking mediation for depression since 2001, yet she was able to continue working until she was laid off in 2004. (Tr. 17, 206, 237). Moreover, Plaintiff's medications were reportedly effective at treating her anxiety, anger outbursts, and panic attacks. (Tr. 17, 207-208, 282).

Plaintiff argues that the ALJ should have given more weight to Dr. Scholl's assessments. However, it was appropriate for the ALJ to discount Dr. Scholl's opinion because he was a family doctor and not a mental health expert. *Ritchie v. Astrue*, No. 3:10-cv-152, 3:10cv152, 2011 U.S. Dist. LEXIS 33041 (S.D. Ohio Mar. 11, 2011) (opinion from claimant's primary care physician not entitled to controlling weight because doctor was not a mental health expert). Moreover, Dr. Scholl's opinion was unsupported by any objective testing, explanations, or clinical observations. Specifically, his opinion was conclusory and properly discounted. *See* 20 C.F.R.§ 404.1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."). Further, Dr. Scholl's findings were also inconsistent with the evidence. (Tr. 18-20). For example, someone as limited as Dr. Scholl suggests would not be able to perform the myriad of daily activities that Plaintiff was able to perform. Plaintiff reported being able to do household chores, including sweeping, dishes, and shopping; and was able to drive to errands and appointments. (Tr. 15, 16, 18-19, 21, 24, 117-123, 205-206, 209, 226). *Meyer v. Comm's of Soc. Sec.*, 1:09cv814, 2011 U.S. Dist. LEXIS 30490, at

\*11 (S.D. Ohio. Feb. 11, 2011) ("As a matter of law, the ALJ may consider [the claimant's] household and social activities in evaluating her assertions of pain or limitations."). Additionally, despite initially alleging disabling mental impairments in 2004, Plaintiff did not enter therapy until October 2006. (Tr. 17, 257). *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) ("In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may case doubt on a claimant's assertions of disabling pain."). Moreover, Plaintiff did not attend therapy sessions consistently, she did not complete assigned work to be done outside therapy, and at least one treating source indicated that Plaintiff was unwilling to make needed changes to her behaviors. (Tr. 17, 272, 309, 310, 316, 318, 332, 342, 348). *See* Soc. Sec. Ruling 96-7p, 1996 SSR LEXIS, at \*7 ("[T]he individual's statements may be less credible if the level or frequency of treatment was inconsistent with the level of complaints."). In fact, Plaintiff's mental health treatment was terminated due to non-compliance, and Plaintiff "did not appear disturbed or upset" when told her case would be closed. (Tr. 272).

    While the evidence of record shows that Plaintiff suffers from depression and anxiety, the ALJ's determination that these mental impairments impose no more than minimal limitations on Plaintiff's ability to function in any work-related area finds substantial support in the record. Therefore, the ALJ properly rejected Dr. Scholl's opinions by finding them unsupported and inconsistent with his treatment records and the record evidence.

## C.

Next, Plaintiff maintains that she is physically more limited than found by the ALJ. The ALJ found that Plaintiff had severe PAD, but determined that she could perform light work as long as she did not have to stand for more than four hours a day or for more than 30 minutes at a time. (Tr. 20).

Dr. Lynne Torello evaluated Plaintiff's functional capacity on behalf of the state Bureau of Disability Determination. (Tr. 22). Dr. Torello indicated that Plaintiff could lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; sit about six hours in an eight-hour workday; and stand/walk at least two hours in an eight-hour workday. (Tr. 245). This is consistent with light work. 20 C.F.R. § 404.1567(b). In her notes explaining these limitations, Dr. Torello clarified that Plaintiff "has limited ability to stand and walk . . . [she can] stand walk 4 hr/d [hours per day] in 30 min intervals." (Tr. 246). In determining Plaintiff's RFC, the ALJ explained that the state agency reviewing physician's recommendations "would be satisfied by implementing the additional restriction of standing four hours per day at 30 minute intervals." (Tr. 22). Plaintiff, however, argues that this RFC is inconsistent with Dr. Torello's recommendations. This argument is unavailing, as the very instruction that Plaintiff can "stand/walk 4 hours per day in 20 minute intervals" comes from Dr. Torello's own statement. (Tr. 22, 246). At the hearing, when the ALJ stated that he understood Dr. Torello's notes to recommend that Plaintiff "stand and walk for a total of four hours a day with – at 30-minute intervals," Plaintiff's counsel confirmed that this was his

-17-

understanding of the notes as well. (Tr. 50).

The work restrictions given by Dr. Lebamoff also tracked Dr. Torello's recommendation. Dr. Lebamoff indicated that if "work restrictions [are] needed, they are as follows: no heavy lifting." (Tr. 21, 230). He also wrote that Plaintiff was "unable to do prolonged ambulation." (Tr. 21, 230). These limitations are consistent with the ALJ's RFC determination of light work, which involves lifting no more than 20 pounds occasionally and 10 pounds frequently and the standing limitation of four hours in 30 minute intervals. (Tr. 20).

Finally, Plaintiff argues that the ALJ did not include all of Dr. Torello's recommendations into her RFC determination. Specifically, Dr. Torello noted that Plaintiff should avoid unprotected heights, hazards, dangerous moving machinery, and commercial driving; she should never climb ladders/rope/scaffolds; and she could only occasionally climb, balance, stoop, kneel, crouch or crawl. (Tr. 246, 248). The ALJ's failure to include these limitations is harmless error because Plaintiff can still perform her past relevant work despite these limitations. An accounting clerk never has to climb, balance, stoop, kneel, crouch or crawl. DICOT 216.482-010 (listing these postural positions as "not present").[14] Even if the ALJ had included each postural and environmental limitation recommended by Dr. Torello, Plaintiff could still perform her past relevant work of accounting clerk. (Tr. 23-24).

---

[14] According to the Dictionary of Occupational Titles, the accounting clerk position involves "sitting most of the time, but may involve walking or standing for brief periods of time." DOT 216.482-010. Sedentary jobs require standing or walking occasionally, which may be up to one-third of a work day, or less than three hours. 20 CFR § 404.1567(a).

The issue is not whether the record could support a finding of disability, but rather whether the ALJ's decision is supported by substantial evidence. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).  Substantial evidence supports the ALJ's finding that Plaintiff could perform a limited range of light work and that she was not disabled.

### III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing.  The ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that Sherry Riley was not entitled to disability insurance benefits, is found to be **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and, as no further matters remain pending for the Court's review, this case is **CLOSED.**


Date:  2/21/12                                       *s/ Timothy S. Black*
                                                                 Timothy S. Black
                                                                 United States District Judge